UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| KAREN A. PULKKINEN, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | 2:09-cv-00099-DBH |
| FAIRPOINT COMMUNICATIONS INC., *et al.*, | ) ) ) ) | |
| Defendants | ) | |

**RECOMMENDED DECISION
AND ORDER DENYING MOTION TO SUPPLEMENT**

Karen Pulkkinen has sued her former employer, Verizon New England, alleging violations of the Americans with Disabilities Act, the Maine Human Rights Act, and Maine's Whistleblower Protection Act. Pulkkinen alleges she was the victim of discriminatory employment practices on the basis of sexual harassment. She also alleges that she was the victim of discriminatory employment practices, including termination, in retaliation for reporting a violation of law. Finally, Pulkkinen alleges she was terminated because of her disability. The allegations stem from events that began in 2002 when Pulkkinen first complained that she was being sexually harassed by a co-worker. The parties disagree over the sexual harassment allegations. After a lengthy investigation Verizon concluded that no such harassment occurred. In any event, eventually Pulkkinen left work, claiming post-traumatic stress disorder, arising from events that Verizon concluded had never happened. When Verizon's third party disability plan administrator, MetLife, determined that Pulkkinen was able to return to work, Pulkkinen demurred. Verizon terminated her employment in light of her refusal to return to work without

conditions. Verizon has now moved for summary judgment.[1] I recommend that the court grant Verizon's motion.

## MATERIAL FACTS

The following factual statement is drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). The underlying statements are found in the Defendant's Statement of Material Facts ("DSMF," Doc. No. 67), the Plaintiff's Opposing/Additional Statement ("POS," Doc. No. 71), and the Defendants' Reply Statement ("DRS," Doc. No. 76).[2]

In 2006, after receiving Karen Pulkkinen's complaints of harassment by a co-worker, Verizon retained the services of Amy Homans, who had previously worked for twenty years as a fraud investigator in the Maine Attorney General's Office, to investigate Pulkkinen's claims.

---

[1] Following the submission of her brief in opposition to the motion for summary judgment, Pulkkinen filed what she has styled a "motion to supplement summary judgment record" (Doc. No. 73). In opposing the motion the defendant treated the motion as one for extension of time, suggesting that Pulkkinen had ample time to file a response and did indeed file a lengthy response accompanied by numerous exhibits. Pulkkinen requests in her motion that she be given leave to augment the record with additional attachments, but she does not explain exactly what those additional attachments might be. Since nothing in the motion to supplement suggests that Pulkkinen's supplement will conform to Local Rule 56 and since she has not articulated exactly what additional exhibits she wants to file, I now deny her motion.

[2] As Verizon notes in its reply memorandum (Doc. No. 75 at 2), Pulkkinen has not complied with Local Rule 56(c) in that her opposing statement of material facts neither admits, denies or qualifies the thirty-one paragraphs of defendant's statement of material fact. Under Local Rule 56(f), those thirty-one paragraphs are deemed admitted if supported by record citations and material to the legal issues raised by the motion. Nevertheless, heeding the advice set forth in Clarke v. Blais, 473 F. Supp. 2d 124 (D. Me. 20070 (Hornby, J.), I have considered Pulkkinen's affidavit and noted where a genuine dispute of material fact might have been generated. Unlike Clarke, this matter is anything but a straightforward excessive force case involving a prisoner inmate. Furthermore, Pulkkinen is representing herself after having had the benefit of experienced counsel during the administrative phase of this case, unlike Clarke who repeatedly asked the court to "appoint" pro bono counsel to represent him.

(DSMF ¶ 1.) Homans took forty interviews of twenty-one people, including, among others, Pulkkinen (who was represented by counsel), Dean Celani, the alleged harasser, and essentially every other employee who had worked with the two of them at the Lewiston garage, and issued a comprehensive 77-page report on December 11, 2006. (Id. ¶ 2.) Not only did Homans fail to find any merit to Pulkkinen's claims of harassment, but she ultimately concluded:

> [T]here are reasonable grounds to believe that Karen Pulkkinen has engaged in behavior of a harassing nature towards Dean Celani. Specifically, . . . Karen has engaged in a course of hostile and harassing conduct that includes a physical assault, false allegations, threatening behavior, and demeaning comments intended to cause embarrassment and humiliation over a period of more than four years.

(Exhibit B Award of Arbitrator ("Homans Report") at 6-7, Doc. No. 10-2.)

Based on Homans's findings, and the fact that Pulkkinen conceded that she and Celani could not work together safely, Verizon suspended Pulkkinen for fifteen days for gross misconduct and violations of the Code of Business Conduct, and transferred her to the Portland garage and away from Celani. (DSMF, ¶ 4.) Pulkkinen's daughter was then enrolled in school in Portland; her longtime boyfriend, Mike Pallozzi, also an employee at the Lewiston garage, had a house there; and Pulkkinen herself had previously sought a transfer to Portland for a more lucrative position. In fact, Verizon offered to transfer Mr. Pallozzi to Portland as well so that he and Pulkkinen could continue working together. (DSMF ¶ 5, incorporating reference citations to Doc. No. 52-3 at 312 and Doc. No. 10-2 at 63.)[3]

---

[3] In accordance with accepted CM/ECF procedures, defendant did not refile all of the exhibits with the Arthur Telegen affidavit, but instead referenced other docket entries where the exhibit had been previously filed. This procedure is all well and good when the other docket reference is accurate. Unfortunately, defendant missed the mark on a number of entries, sending me on a wild goose chase through the docket. Many of their record citations are to "Exhibit A" but there is no "Exhibit A" attached to the Telegen affidavit. In fact, there is no docket entry for an Exhibit A anywhere that comes close to providing the record support for the facts stated. After some frustration, I located the transcript citations at Docket No. 52-2 through 52-5, Exhibits B-1 through C.

In response, IBEW Local 2327 filed a grievance on Pulkkinen's behalf and the parties engaged in a three-day arbitration under the terms of their collective bargaining agreement. (Id. ¶ 6.) The Union was represented by Harold Lichten, an attorney with experience both in labor law and in discrimination litigation. (Id. ¶ 7.) The result was an arbitration award of more than 64 pages. (Id. ¶ 7.) The arbitration panel, chaired by arbitrator Mark L. Irvings, determined:

> Without crediting any [hearsay] statements [or opinion testimony] . . . there is ample evidence in the record, including the live testimony given by the protagonists at the arbitration, to establish that Pulkkinen was the harasser, not the victim, in this long running workplace conflict; and that her very serious allegations that Celani repeatedly tried to physically harm her were contrived for the purpose of forcing Celani out of his line position in Lewiston.

(Doc. No. 10-2 at 52.) Arbitrator Irvings determined that Verizon's 15-day suspension and transfer of Pulkkinen to Portland were justified and did not violate the collective bargaining agreement. (Id. at 62-63.) In addition to these arbitral findings, Pulkkinen herself acknowledged that she and Mr. Celani could not work together safely. (Id. at 22.)

Pulkkinen subsequently refused to report to the Portland garage and was out of work from January to June of 2007, claiming disability for post-traumatic stress disorder, the stress being attributed to Celani's alleged, but unsubstantiated, harassment of her. (DSMF ¶ 13.) As a result, Verizon sent Pulkkinen a Return to Work Letter and Final Warning, dated January 11, 2007. (Id. ¶ 15.) After Pulkkinen repeatedly refused to return to work,[4] Verizon terminated her for having failed to do so without justification. (Id. ¶ 16.) Verizon's benefits provider, MetLife, later determined that Pulkkinen was not disabled and could, in fact, work. (Id. ¶ 14.)

---

[4] Pulkkinen did physically appear for work on the date she was ordered to do so in June 2007, but she refused to work unless her supervisor, David LaRose, would sign a medical release she had drafted. Not only did her supervisor not have the authority to sign such a release on behalf of Verizon, but Pulkkinen was required to return to work absent such a release, and refused to do so. Pulkkinen was not dressed for work when she arrived and she refused to do light work. (Id. ¶ 17.)

4

Verizon states that it is not its regular practice to await the outcome of employee appeals to MetLife before taking disciplinary action where appropriate. Such appeals can take months, and generally do not materially alter MetLife's initial determination. If MetLife reverses its initial decision, Verizon will reinstate the employee. (Id. ¶ 18.) Pulkkinen's appeals have all now been adjudicated and MetLife's initial determination stands that she was not disabled and could (and should) have returned to full duty. (Id. ¶ 19.)

The Union challenged Verizon's termination of Pulkkinen at arbitration, and again was represented by Attorney Harold Lichten. (Id. ¶ 20.) Pulkkinen's own medical expert, Dr. Gregory Nevens, testified at the arbitration that had she not been harassed, she would not be able to claim post-traumatic stress disorder, and thus would not have been disabled. (Id. ¶ 21.) A different arbitration panel, led by arbitrator Roberta Golick, issued a 23-page decision finding that Verizon had just cause to terminate Pulkkinen's employment. (Id. ¶ 22.)

Pulkkinen subsequently filed the instant lawsuit against Verizon, alleging (1) that she was treated less favorably than Celani and was terminated because she is female (*i.e.*, sex/gender discrimination); (2) that she was subject to harassment by Celani that Verizon failed to prevent or correct (*i.e.*, hostile work environment sexual harassment); and (3) that her suspension, transfer, and termination were retaliatory (*i.e.*, retaliation for protected activity). With respect to her retaliation claim, Pulkkinen alleges that by "report[ing] a violation of law, or what she reasonably believed to be a violation of law, to [Verizon], she engaged in a protected activity, for which she was suspended, transferred, and terminated as a result." (Id. ¶ 24.) Although Pulkkinen also asserts in a stand-alone paragraph at the end of her amended complaint that Verizon violated the Americans with Disabilities Act by terminating her employment, she

5

does not assert this as an independent cause of action or provide any factual allegations relating to the claim. (Id. ¶ 25.)

Following a discovery conference requested by Pulkkinen, the court (Kravchuk, M.J.) ordered, *inter alia*, that she "provide to [Verizon] in writing and under oath, all those facts she intends to rely upon to support her contentions that [Verizon] discriminated against her because of her 1) gender and 2) disability" in order to provide an answer to a pending interrogatory that had been served upon her. (Id. ¶ 26.) In response, Pulkkinen sent Verizon a 19-page missive that detailed the perceived inaccuracies of the Homans report, and stated in conclusory fashion that the report was biased against her as a woman. The only "fact" noted by Pulkkinen relating to Verizon's alleged bias against women was that the majority of the witnesses against her were male. (Id. ¶ 27.) An example of Pulkkinen's assertions follows:

> Homans report was unjust and incorrectly documented. Judge Kravchuk asked Plaintiff to describe the facts that would prove Defendant has discriminated against Plaintiff because of gender and disability. There is [*sic*] countless indiscretions [in] the Homans Report. Defendant was wrong and created a suspicion of mendacity. There are countless of [*sic*] statements that were used to purposely discredit the Plaintiff because of gender and disability and are a direct act of discrimination against Plaintiff because she is a woman. Shows inaccurately documented facts.

(Doc. No. 69-5 at 13.)

In the course of her interrogatory response, Pulkkinen acknowledged that Verizon relied on Homans and MetLife in disciplining her. Verizon offers that it was reasonably justified in relying upon the Homans Report and MetLife's determination in making its decisions to suspend, transfer, and terminate Pulkkinen. According to Verizon, Pulkkinen's response fails to explain why Verizon would not be justified to rely on these third-party findings. (DSMF, ¶ 31.)

In response to these relatively straightforward thirty-one paragraphs, Pulkkinen filed a 140-paragraph opposing statement of material facts, without admitting, denying or qualifying

6

any of Verizon's facts. In fact, the material facts submitted by Verizon, recited above, do not appear to be in genuine dispute, except for the characterization in paragraph 31 that Pulkkinen fails to generate any real issue about the reliability of the Homans Report or the MetLife disability determination.

Based on Pulkkinen's submission, it is plainly her contention that Verizon was not justified in relying on either Homans or MetLife and that the alleged reliance is only offered as a pretext for gender-based discrimination.[5] To support her contentions, Pulkkinen has submitted seventeen exhibits accompanied by an affidavit concerning the exhibits' authenticity.[6] Some of the exhibits are cited in support of the 140 paragraphs and I have considered the referenced exhibits *to the extent they support statements of fact*, but I have not credited those paragraphs of Pulkkinen's opposing statement of material fact that are not adequately supported by a record

---

[5] I agree with Verizon that neither the complaint nor the summary judgment record sets forth a straightforward claim under the Americans with Disabilities Act. Pulkkinen's "theory," based upon her complaint, appears to be that her retaliation count arises in part under the ADA as well as Maine's Whistleblower's Protection Act. Pulkkinen alleges she was terminated in violation of the ADA, but since the undisputed evidence is that Verizon never for one moment regarded her as disabled, the record is devoid of any evidence that would support a finding of discriminatory animus against the disabled sufficient to maintain an action under the ADA. All of the "facts" giving rise to this claim flow from what Pulkkinen perceives as Verizon's gender-based discrimination against her. Pulkkinen includes an exhibit (Doc. No. 72-13) that suggests that the EEOC is investigating Verizon, circa 2009, for alleged violations of the ADA because of unlawful terminations of employees for violating its "attendance plans." Pulkkinen's termination was not based upon successive discipline under a step plan based upon "no fault" chargeable absences, the subject of the EEOC investigation. The discipline against her, the fifteen day suspension, was based upon her perceived harassment of Celani. Her discharge was based upon her failure to return to work when the Plan Administrator determined that she was not disabled.

[6] Pulkkinen also references the Harold Lichten Report in paragraph nine of her opposing statement of fact. I cannot find the Lichten report on this docket. Pulkkinen's motion to supplement (Doc. No. 73) makes no mention of this missing exhibit. Obviously I cannot credit "facts" based upon this nonrecord source. Additionally, many of her other exhibits, such as e-mails or letters from the defendant, have been annotated by someone, presumably Pulkkinen, but those comments themselves are either meaningless or rank hearsay and not presented to the court in the form of an affidavit by a person with personal knowledge. Her affidavit (Doc. No. 72) attempts to authenticate the exhibits and in some cases does so, but in other cases it merely characterizes the exhibit without identifying what it actually is. For example, paragraph 19 reads: "attached hereto as Exhibit Q is a true and accurate copy of Defendant's disregard to handle plaintiff's harassment complaints for over four years. Defendant knew there were ongoing problems, yet chose to do nothing about providing Plaintiff with a safe working environment." Exhibit Q, upon examination, turns out to be a handwritten note by an unknown person talking about the ongoing problems between Pulkkinen and Celani. The note is written in the first person by someone who apparently looked into the relationship between the two antagonists. It has nothing to do with gender or disability discrimination. At the end of the handwritten note, Pulkkinen has a jurat swearing to its "truth." The exhibit has no evidentiary value.

7

citation. Nor have I considered the exhibits submitted by Pulkkinen but never referenced in her statement of material facts. Thus, in addition to the facts as put forth by Verizon, the following facts are part of this summary judgment record.

Pulkkinen made a complaint, the exact nature of which is unspecified, in 2002, and it was investigated by Verizon. Verizon determined that the complaint was not EEO related. In 2006 Verizon hired Amy Homans to investigate Pulkkinen's work environment. (POS ¶ 6.) In 2002, Moses Collier, the supervisor in the Lewiston garage, sent Sally Nason, a member of Verizon's management, an e-mail indicating that Pulkkinen's complaint regarding Dean Celani was not viewed as EEO related and no further company action was taken. (Id. ¶ 19.) According to Pulkkinen, she sent Paul McGovern a letter on October 25, 2003, complaining about ongoing harassment at the Lewiston garage based upon her gender. According to Pulkkinen, she was at that point in time enduring "daily threats, verbal remarks, derogatory statements about women and physical gestures, which concern me." (Id. ¶ 135.)[7] On October 12, 2007, the Maine District Court, without making any findings of harassment, entered an agreed to order in the case of Pulkkinen v. Celani in the Lewiston District Court. (Id. ¶ 8.)

Pulkkinen received a suspension from work from December 17, 2006, to January 13, 2007, allegedly because of her harassment of Celani. The Maine Department of Labor found that the suspension did not meet the definition of "misconduct in connection with his employment" and granted her unemployment benefits for that time period, and charged Verizon with an unfavorable Employer's Experience Rating. The Maine Department of Labor also allowed Pulkkinen unemployment benefits from July 1, 2007, forward if otherwise eligible, but

---

[7] There is no place in any of the record citations put forth by Pulkkinen, nor in her 140 paragraphs of "fact," any further detail concerning what form this workplace harassment took. The bulk of her "factual" presentation consists of her claim that Celani tried to run her over at the garage, which he denies and which formed the basis of the state court harassment order, as I understand it. Clearly there are many disputed facts about what occurred between Celani and Pulkkinen, but this summary judgment motion does not need to resolve that factual dispute.

found that "separation was voluntary without good cause attributable to such employer." (Id. ¶ 20.)

The situation in the Lewiston garage between Celani and Pulkkinen festered for a long period of time and initially Verizon management did not take an active role in attempting to referee the situation. (Id. ¶ 25.) At the arbitration panel hearing, counsel for Verizon noted during his opening statement that the company had relied upon the Homans Report when it decided to discipline Pulkkinen. (Id. ¶ 42.)

Pulkkinen received a doctor's note on November 14, 2002, indicating she was suffering from severe anxiety and recommending that she take a leave of absence from work. She also produced an undated note from a psychiatric nurse practitioner indicating that she had been diagnosed with depression due to work related stress over a three-year period. (Id. ¶ 17.) During 2004, Pulkkinen received an approved absence from work for health-related reasons from March 10, 2004, to July 18, 2004, and apparently extended through December 5, 2004. (Id. ¶ 57.) According to Pulkkinen, this 2004 event is connected because in 2004 she disregarded her health provider's advice and returned to work. (Id. ¶ 77.) The injury in 2004 related to a wound in her right leg. (Id. ¶ 78.) Pulkkinen claims her approval was "for FMLA date through May 11, and 2007." (Id. ¶ 57.) Her Exhibit H does not appear to support this assertion.[8] Pulkkinen explains somewhat later in her presentation that the 2004 events were an "elicit threat" that had left her with no alternative but to return to work without having medical clearance. (Id. ¶ 64.) However, the documents themselves do not contain any threats or intimidation and Pulkkinen does nothing to put them into context.

---

[8] I am completely flummoxed by the discrepancy in the dates. I do not know what the 2004 dates have to do with the events related to the 2006-2007 suspension and eventual termination. It is the same problem I have with the date on the protection order submitted by Pulkkinen. It is dated October 2007, but the events seemingly occurred in 2006.

9

As of April 17, 2007, Pulkkinen's absence from work was no longer certified by MetLife. However, Verizon's FMLA administrator advised Pulkkinen by letter dated April 16, 2007, that the period of April 22, 2007, through June 11, 2007, would be authorized FMLA leave. (Id. ¶ 67.) When Pulkkinen received notification that she would be terminated if she did not return to work in June 2007, she was still actively appealing MetLife's disability determination and her treating psychologist continued to report that she would be returning to work against medical advice. (Id. ¶ 100.)

## Discussion

Pulkkinen's amended complaint (Doc. No. 23) raises four possible claims under state and federal law. Count I presents a claim of gender discrimination based upon the discipline she received and her termination.[9] Count II presents a claim of sexual harassment in the workplace based upon her gender and arising because of the conduct of Celani at the Lewiston garage. Count III presents a claim of retaliation under Maine law based upon her report of what she perceived as Celani's unlawful conduct and arising because of the 15 day suspension and, ultimately, her termination. Count III also contains a claim of disability discrimination based upon Verizon's refusal to accept the treating physicians' notes and arising because of her termination. Verizon has moved for summary judgment on all four claims. I will discuss them in order.

### A. Gender Discrimination

The crux of Pulkkinen's gender discrimination case is that Verizon disciplined her and ultimately terminated her employment because she is a woman. There is no direct evidence that Verizon's decision was based on Pulkkinen's gender. In the absence of direct evidence that sex

---

[9] It is not entirely clear whether the gender-based claims are based on Title VII or the MHRA, but in the end it does not matter because federal law guides the construction of the MHRA in these circumstances.

10

was used as a factor in an employment decision, proof of sex discrimination ordinarily requires the plaintiff to demonstrate, among other things, the prima facie elements of a claim. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (establishing the burden of proof for summary judgment contests). The prima facie showing entails a showing that (1) the plaintiff is a member of a protected class; (2) the plaintiff's employer took an adverse employment action against her; (3) the plaintiff was qualified for the employment she held; and (4) the plaintiff's position remained open or was filled by a person with similar qualifications. Id. at 802; Kosereis v. Rhode Island., 331 F.3d 207, 212 (1st Cir. 2003) (involving prima facie case of gender discrimination). Upon making this presentation, "the burden of production—but not the burden of persuasion—shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse employment action." Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010). The focus then returns to the plaintiff, "who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." Id.; see also Cookson v. Brewer Sch. Dep't, 2009 ME 57, ¶ 14, 974 A.2d 276, 281 ("Federal law guides our construction of the MHRA. Accordingly we apply the burden-shifting analysis first described in McDonnell Douglas.")

Verizon is willing to concede that Pulkkinen can make out a prima facie case under the McDonnell Douglas burden-shifting analysis in respect to her gender discrimination claim. (Def.'s Mem. at 10.) However, Verizon claims it terminated Pulkkinen because she refused to unconditionally return to work from medical leave when MetLife, Verizon's disability plan administrator, determined that she was not disabled. Verizon claims that this decision was not a pretext for gender discrimination. In support of that contention, it notes that its disciplinary

suspension and transfer of Pulkkinen had been based upon a detailed analysis of an outside investigator hired by the company to investigate the situation at the Lewiston garage between Celani and Pulkkinen and that its decision to terminate was based upon its plan administrator's determination about Pulkkinen's claimed disability. Pulkkinen spends a great deal of energy attempting to discredit both the outside investigator and MetLife, but clearly Verizon has met its burden of production and put forth legitimate, non-discriminatory reasons for first, the discipline, and then, the termination. Pulkkinen must put forth sufficient evidence to generate a triable issue of fact on the ultimate issue of intentional discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

Leaving aside Pulkkinen's Local Rule 56 failures, the record she has generated demonstrates that she disputes many of the factual findings in the Homans Report and disagrees entirely with its conclusion. Those factual disputes, however, do not necessarily create a genuine dispute of material fact regarding Verizon's discriminatory animus. Assuming for the moment that Homans was completely wrong and that Celani was actually the instigator and the aggressor in the longstanding Celani/Pulkkinen dispute, there is nothing in the facts put forward by Pulkkinen that is probative of gender animus on the part of Verizon. There is no evidence of any stray comments from Verizon's management suggesting that, for instance, Pulkkinen needed to be more of a "man" in her dealings with Celani. The record is devoid of any reaction by Verizon management other than reasonable attempts to mediate the dispute and ultimately to resolve what had become an intractable problem. Pulkkinen presumably argues that Verizon's gender animus can be inferred because it allowed the situation between her and Celani to fester for a number of years. However, this case is unlike Crowley v. L.L. Bean, where the female complainant clearly described sexually provocative conduct by the male co-worker in her complaints to superiors.

12

303 F.3d 387, 398-99 (1st Cir. 2002) (describing incidents of stalking including uninvited entry into her home, sexual attraction by male co-worker to complainant, and enforced close physical encounters in tight spaces). In this case Pulkkinen's complaints, at least as set forth in the summary judgment record, were conclusory in nature and, when not conclusory, described behavior that contained no gender specific nuance, such as a threatening operation of a motor vehicle. Pulkkinen has simply developed no evidence that Verizon's decision to discipline and/or terminate her because of the longstanding Celani/Pulkkinen dispute was based upon her gender.

B.   **Sexual Harassment in the Workplace**

Pulkkinen's hostile work environment claim requires proof that she was subjected to harassment in the workplace based upon her gender and that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create a work environment that was both objectively and subjectively hostile or abusive. O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-89 (1998), Harris v. Forklift Systems, Inc., 510 U.S. 17, 20-23 (1993), and Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-73 (1986)). See also Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 258 n.2 (1st Cir. 1999) (observing that "courts typically apply Title VII standards to claims of sexual harassment under the MHRA"). The critical issue is whether Pulkkinen was exposed to "disadvantageous terms of employment to which members of the other sex [were] not exposed." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

Verizon argues that Pulkkinen cannot carry the burden of proving the existence of a hostile work environment claim because based upon the evidence marshaled by Pulkkinen no reasonable factfinder could fairly conclude that she experienced "severe" or "pervasive"

13

harassment at Verizon. (Mem. in support of Mot. Summ. J. at 16-18, Doc. No. 66.) The "severe or pervasive" standard is prescribed in order to screen from trial those sexual harassment lawsuits that, if permitted to go to trial, would effectively turn federal and state anti-harassment legislation into general workplace civility codes. Oncale, 523 U.S. at 81. In order to differentiate between potentially meritorious suits involving severely or pervasively hostile treatment and non-meritorious suits involving basic civility issues characterized by "isolated incidents," "simple teasing," or "mere offensive" behavior, trial judges are expected to use "common sense, and an appropriate sensitivity to social context." Ugurhan Akturk Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003). The court is expected to consider all of the circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher, 524 U.S. at 787-788 (quoting Harris, 510 U.S. at 23).

Pulkkinen has presented a summary judgment record that establishes that she worked in a predominately male environment, that she became embroiled in a longstanding and bitter dispute with one of her male co-workers, and that ultimately, after undertaking its own investigation, her employer concluded that she was at fault for the underlying hostilities. Although she says she was subjected to a barrage of derogatory and threatening statements while working at the Lewiston garage, she does not provide one single specific example in her summary judgment record of the derogatory statements based upon gender made by Celani or any of her other co-workers. The summary judgment record is filled with *conclusory complaints* about derogatory and threatening statements, but is devoid of evidence of what the statements were and who made them. Other than Pulkkinen's own self-serving, conclusory statements, there is absolutely no

evidence here of a hostile work environment. This calls for entry of summary judgment in favor of Verizon on this claim. Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 221 (1st Cir. 2007) (summary judgment should be granted "if the non-moving party rests his case 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'") (citations omitted); Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 66 (1st Cir. 2008) (noting that a plaintiff "cannot rely exclusively on naked assertions, unsupported conclusions, or optimistic surmise" to defeat summary judgment).

**C.    Retaliation**

Pulkkinen claims that Verizon retaliated against her in violation of the Maine Whistleblower's Protection Act, 26 M.R.S.A. § 833. A prima facie case of whistleblower retaliation consists of three elements. The plaintiff must demonstrate: (1) that she engaged in protected activity; (2) that she suffered an adverse employment action; and (3) that a causal nexus exists between the activity and the adverse action. LePage v. Bath Iron Works Corp., 2006 ME 130, ¶ 19, 909 A.2d 629, 636. Adverse employment actions are those actions taken by the employer that "adversely affect the employee's compensation, terms or other conditions of employment." DiCentes v. Michaud, 1998 ME 227, ¶ 21, 719 A.2d 509, 516.

Neither Verizon nor Pulkkinen speaks specifically to the Maine Whistleblower's Protection Act in the briefs, although Count III of the amended complaint is captioned "retaliation" and the complaint requests, at page six, relief pursuant to the Maine statute. Whether Count III is viewed as a claim of retaliation[10] based upon gender under Title VII or a state cause of action, Verizon's position is set forth in its memorandum as follows:

---

[10]    To the extent the retaliation claim is viewed as a form of gender discrimination claim under Title VII, the McDonnell Douglas burden shifting scheme applies. Post-Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), retaliation claims are less susceptible to categorical treatment when it comes to the question of whether or not the employment action was materially adverse. Lockridge, 597 F.3d at 471. A whistleblower action

15

> Plaintiff claims that by "report[ing] a violation of law, or what she reasonably believed to be a violation of law, to [VNE]," she engaged in a protected activity, for which she was suspended, transferred, and terminated as a result. *See* SOF, ¶ 24. This allegation appears to refer to her reporting of Celani's alleged harassment. Plaintiff was not disciplined for good faith reporting of a perceived violation of law, however; she was disciplined after an independent investigation determined that she had created such allegations out of whole cloth in an effort to frame a fellow employee and have him fired, had herself been the harasser, and had refused to report to work after being ordered to do so by VNE and cleared to do so by MetLife. Thus, either (a) Plaintiff's fabricated allegations of harassment do not constitute a protected activity because they were made in bad faith and without basis; or (b) Plaintiff made the allegations in good faith, but Amy Homans seriously erred in determining that Plaintiff had attempted to frame Celani *and* MetLife seriously erred in determining that Plaintiff could return to full duty, in which case VNE's discipline of Plaintiff -- which was based upon Homans' and MetLife's determinations -- was not causally linked to her protected activity. Regardless, Plaintiff can provide no evidence, other than conclusory accusations, that her discipline came as a result of her engaging in protected activity, and her claim, therefore, fails. See Ramos v. Roche Products, *Inc.*, 936 F.2d 43, 49 (1st Cir. 1991) (granting summary judgment to employer where employee's "accusations remain largely conclusory and lacking in the concrete documentation necessary to prove the causal link between her protected activity and her retaliatory treatment").

(Def.'s Mem. at 15.)

Pulkkinen's opposition to the summary judgment motion argues vehemently that Homans and MetLife were wrong, but it is devoid of *evidence* as to why Verizon's decision to accept their findings was based upon discriminatory/retaliatory animus toward Pulkkinen based upon her gender rather than upon a legitimate nondiscriminatory reason. After all, Verizon had two employees relating irreconcilable versions of events and one of them had to be believed over the other in order to resolve the stalemate. Based on this summary judgment record, if Verizon had chosen to believe Pulkkinen over Celani after it received Homans's report, Celani could have

---

under state law may not be subject to the same flexibility regarding the materiality of the adverse action. However, this distinction is irrelevant in the present case because Pulkkinen is complaining about a suspension without pay, a job transfer, and ultimately termination, all of which would clearly be adverse under both Maine law and Title VII. Verizon correctly notes that the focus of the inquiry under either analysis is the causal connection between the protected activity and the adverse action.

just as easily argued that Verizon discriminated against him because of his gender. Pulkkinen has failed to submit exhibits or affidavits of evidentiary quality that properly demonstrate that a trialworthy issue persists on the question of the causal connection between Verizon's adverse employment decisions and Pulkkinen's claimed protected activity or her gender. Rather she has engaged in what the First Circuit aptly describes as "the frenzied brandishing of a cardboard sword." Calvi v. Knox County, 470 F.3d 422, 426 (1st Cir. 2006). Pulkkinen's repeated assertions that Verizon took the action it took because of her gender or in retaliation for her complaining about discrimination based on gender does not become fact simply because it has been asserted so many times in her pleadings.

**D.     Disability Discrimination**

This aspect of Pulkkinen's complaint is the most difficult to address because it defies logical analysis given the disjointed summary judgment record presented by both parties and the tenor of Pulkkinen's argument on the issue of disability discrimination. Pulkkinen included in her factual record references to a leg wound in 2004, suggesting that Verizon's conduct vis-à-vis her return to work in connection with that injury was somehow probative of its discriminatory animus toward her claim of post traumatic stress disability that resulted in her termination. Her written argument also contains reference to this "medical disability" and her desire to pursue this issue before a jury. (Doc. No. 70-1 at 2.) The skeletal information put forth about this 2004 injury has nothing to do with this case that I can discern. It appears to be Pulkkinen's contention that Verizon's decision to terminate her in June 2007 was discriminatory based upon her disability because she should have been allowed to return to "light duty" work as a reasonable accommodation. (Id. at 13-14.) The alleged disability, post-traumatic stress disorder, does not

17

figure into the other adverse employment decisions, *i.e.*, the suspension and the transfer to the Portland facility, as best I can determine.

Neither the summary judgment record as presented by Verizon nor the serendipitous facts put forth in Pulkkinen's various pleadings[11] explain what transpired that led to the events of the January through June 2007 disability determination and Pulkkinen's eventual termination. The situation is clarified to my satisfaction in the Arbitration Award of February 25, 2009. (Doc. No. 69-7.) As the arbitration award notes, the crucial *fact* in assessing whether MetLife's Medical Director's determination regarding Pulkkinen's disability was arbitrary was the medical evidence that Pulkkinen's health care providers gave to MetLife. Specifically, Dr. Nevens, her treating psychiatrist, indicated in March 2007 that Pulkkinen could return to work to her "usual work environment," meaning the Lewiston garage, rather than the transfer assignment to the Portland garage. This unusual pronouncement came after Verizon had imposed the disciplinary transfer, but prior to the first arbitration award affirming the imposition of discipline. Pulkkinen had been ordered to report to the Portland garage in January 2007 and arrived there announcing she was too ill to work. The fact that Pulkkinen's treating psychiatrist would offer such a "puzzling" recommendation, returning her to the very environment where the alleged harassment arose, ultimately led MetLife's medical experts to offer the Medical Director two separate expert opinions that the available clinical information did not support a need for continuing absence from the workplace. (Arbitration Award at 6-7, Doc. No. 69-7.) Verizon's ultimate decision to terminate Pulkkinen's employment when she refused to return to work at the Portland garage cannot be viewed as pretextual as it was based upon MetLife's denial of disability payments

---

[11] Pulkkinen wants some sort of inference to be drawn from the fact that in 2004 she returned to work before she obtained medical clearance. She also attempts to suggest that the questionnaire she received from the EEOC sometime prior to July 19, 2009, concerning an ongoing investigation by that agency relating to Verizon's compliance with the ADA is somehow probative of Verizon's discriminatory intent regarding Pulkkinen's termination. These "facts" add nothing to this summary judgment record.

18

which in turn was grounded in the evidence described above.  Even if MetLife's two reviewing experts were in error and Dr. Nevens's unusual recommendation was right, Pulkkinen has produced absolutely no evidence that Verizon's decision stemmed from discriminatory animus because of Pulkkinen's alleged disability.  The evidence would require a finding that Pulkkinen was terminated by Verizon because the company *believed* she refused to return to work when able to do so.  Pulkkinen has presented no evidence that would support any alternative finding.

**Conclusion**

Based upon the foregoing, Plaintiff's motion to supplement is DENIED.  I recommend that the court grant Verizon's motion for summary judgment and enter judgment for the defendant on all counts of the amended complaint.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

November 30, 2010